IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DANA CHERYL RIVERS,              )
                                 )
      Plaintiff,                 )
                                 )
vs.                              )          CIVIL ACTION NO 04-0369-P-L
                                 )
JO ANNE B. BARNHART,             )
Commissioner of Social Security, )
                                 )
      Defendant.                 )

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  Oral argument was waived and the matter was taken under submission on March 18, 2005. (Docs. 17, 18). Upon consideration of the administrative record, oral argument and the memoranda of the parties, it is recommended that the decision of the Commissioner be **reversed and remanded.**

I.      <u>Issues on Appeal</u>

    1. Whether the Administrative Law Judge (ALJ) erred in failing to comply with the doctrine of collateral estoppel.

    2. Whether the ALJ erred in failing to pose a proper hypothetical question to the vocational expert.

    3. Whether the ALJ erred in rejecting the opinion of Blaine C. Crum, Ph.D.

## II.   __Background Facts__

Plaintiff was born September 6, 1975 (Tr. 121) and was twenty-seven years old at the time of the administrative hearing on April 9, 2002.  She completed the tenth grade and has no past relevant work. (Tr. 610, 293).  Plaintiff alleges that she became unable to work on August 8, 1995 because of the effects of idiopathic thrombocytopenia purpura[1] (ITP), shortness of breath, faintness, and a racing heart. (Tr. 121, 127).

## III.   __Procedural History__

Plaintiff applied for supplemental security income on May 1, 1996, with a protective filing date of April 24, 1996. (Tr. 121-124).  The application was denied initially and on reconsideration. (Tr. 83-88, 89-94, 97-99). On February 5, 1997, the first administrative hearing was held before the ALJ and plaintiff, her attorney and a vocational expert (VE) were present. (Tr. 37-64).  After the hearing, the ALJ remanded the claim to the State Agency for evaluation of plaintiff's mental impairment and on August 11, 1997, the second administrative hearing was held before the ALJ.  Plaintiff, her attorney and a different vocational expert attended the hearing. (Tr. 65-81).  On August 15, 1997, the ALJ entered a decision wherein he found the plaintiff not disabled. (Tr. 12-24).  On November 29, 1999, the Appeals Council denied the request for review and the hearing decision became the final decision of

---

[1] "Idiopathic thrombocytopenic purpura is a bleeding disorder characterized by too few platelets in the blood . . . because platelets are being destroyed by the immune system.  Idiopathic means the exact cause of the disease is unknown.  Because more is being learned about the autoimmune nature of the disease, it is sometimes called immune thrombocytopenic purpura."  National Library of Medicine, National Institutes of Health. www.nlm.nih.gov/medlineplus.  Symptoms include bruising, nosebleeds or oral bleeding, bleeding into the skin which is also called "pinpoint red spots and petechial rash" and abnormally heavy menstruation. Id.

the Commissioner of Social Security. (Tr. 5-6).

Plaintiff appealed the decision to the U. S. District Court for the Southern District of Alabama. (Tr. 323-325).  The Commissioner of Social Security filed a motion for remand which was granted by order and judgment dated October 11, 2000, and the claim was remanded to the Commissioner for further administrative proceedings. (Tr. 330-331).  In November 2001, the Appeals Council remanded the claim to the ALJ and a third administrative hearing was held on April 9, 2002.  Plaintiff, her attorney, a medical expert and a vocational expert were present. (Tr. 606-626).  On June 27, 2002, the ALJ entered a decision wherein he found plaintiff was not disabled. (Tr. 293).  The Appeals Council denied plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner. (Tr. 272-275).

During the pendency of this claim, plaintiff filed another application for supplemental security income benefits on February 24, 2000 with a protective filing date of January 4, 2000.   (Tr. 408-411).  Her application was denied (Tr. 389-393) and an administrative hearing was held on July 9, 2001 before a different ALJ.  (The transcript is not in the present record).  On July 23, 2001, the ALJ found plaintiff was disabled and she began receiving benefits retroactive to her protective filing date of January 4, 2000. (Tr. 304-312).[2]

## IV.   Findings of the Administrative Law Judge

The ALJ found plaintiff has the severe impairments of idiopathic thrombocytopenic purpura,

---

[2]  The ALJ found plaintiff has the severe impairments of ITP, adjustment disorder with depressed mood, anemia, shortness of breath and weakness. (Tr. 311).  He found plaintiff's functional limitations resulting from her impairment significantly compromised her ability to perform sedentary work and thus she was unable to perform her past relevant work or other work. (Tr. 311).

dysthymic disorder, and panic disorder without agoraphobia which did not last for twelve consecutive months. (Tr. 287, 293).  The ALJ found that these impairments singly or in combination did not meet or medically equal a listing in the Listing of Impairments. 20 C.F.R.  Pt. 404, Subpt. P, App. 1. (Tr. 293).

He found plaintiff's allegations of pain and other subjective complaints were not fully credible. (Tr. 291, 293).  The ALJ found plaintiff has the residual functional capacity for unskilled light exertional work which does not include work at heights or around moving machinery and without more than occasional contact with co-workers, supervisors and the general public. (Tr. 291).  He also found plaintiff was mildly restricted in her activities of daily living, moderately restricted in the ability to maintain social functioning, would experience moderate deficiencies of concentration, persistence or pace, but would not experience episodes of decompensation. (Tr. 291, 293).  The ALJ found that plaintiff has no past relevant work experience. (Tr. 293).  Based upon her residual functional capacity and the hypothetical questions presented to the Vocational Expert (VE), the ALJ found that she could perform other work which exists in significant numbers in the national economy and was not disabled. (Tr. 292-293).

**V**.    **Plaintiff's Testimony**

At the April 9, 2002, hearing, plaintiff testified as follows:

Plaintiff lives with her boyfriend and her two children who are six and nine years old. (Tr. 612). Her younger sister helped with the children when they were smaller.  Her sister also cooked and cleaned the house and bathed and dressed the children. (Tr. 613).  Her last job was working as a waitress for twenty hours each week for a couple of months. (Tr. 614-615).

Plaintiff testified that the problems caused by ITP, depression and panic attacks during the time frame from August 1995 through January 3, 2000, were basically the same as the present time. (Tr.

4

610).  Plaintiff also testified that her conditions have worsened over the years.  Her blood count is not

normal, her depression and anxiety are worse, as is her social life. (Tr. 613).   She can "be around

nobody." (Tr. 613).   Plaintiff testified that she had recently begun to see a mental health counselor

though she had tried to obtain treatment in 1999. (Tr. 611).

Plaintiff testified that she has daily back and leg pain which varies between a constant pain to a

"little nagging pain like a numbness feeling." (Tr. 612).  Her conditions are disabling because of fatigue,

weakness, and dizziness on rising. (Tr. 614).

## VI.  <u>Vocational Expert Testimony</u>

At the hearing, the VE testified that unskilled work, typically, would not include "a lot of

changes" in the work setting, but would be repetitive work without "a lot of variance". (Tr. 620).

The ALJ asked the VE to assume a hypothetical person who was twenty years old with a tenth grade

education and past work experience as a waitress and butcher meat cutter and wrapper which did not

constitute past relevant work.  The ALJ asked the VE to also assume the person was limited to light

exertional work without exposure to hazardous machinery and height.  The ALJ asked the VE to also

assume the person would be limited to unskilled work and "work that involved only occasional

interaction with [the] general public, coworkers and supervisors." (Tr. 621).  The VE responded that

the person could perform the job of laundry folder, cafeteria attendant, and hotel housekeeper. (Tr.

621-622).

The ALJ then added the elements of intermittent fatigue which would cause a one day per week

absence from work on a regular basis.  The VE responded that the person could not sustain the jobs

identified. (Tr. 622).

The ALJ then added to the first hypothetical question, the elements of a "marked limitation in the ability to maintain attention and concentration for extended periods", "a marked limitation in the ability to work in coordination with or proximity to others without being distracted by them and a marked limitation in the ability to accept instructions and respond appropriately to criticism from supervisors." (Tr. 622). The VE responded that the person could not sustain the jobs identified. (Tr. 622).

## VII.  __Medical Expert Testimony__

The ALJ asked the medical expert, John Davis, Ph.D., to consider whether plaintiff had a mental impairment during the time period from August 1995 through January 2000. The ME responded that it was "reasonable to believe" that plaintiff had "some depression secondary to her general medical condition" and that if there was a disabling factor it would be her medical condition but he was not qualified to make a judgment in that regard. (Tr. 616-617). Dr. Davis testified that plaintiff's tenth grade education might limit her to unskilled or semi-skilled work but not her depression. Dr. Davis testified that plaintiff might be affected in the area of social interaction because of her depression and that she "might struggle with supervisors or co-workers or . . . the public." (Tr. 617).

On questioning from plaintiff's counsel, the ME testified that a person diagnosed with depression who had frequent deficiencies of concentration, persistence and pace and frequent episodes of deterioration or decompensation in . . . work-like settings, as found by Dr. Crum who psychologist who examined plaintiff in 1997, would met Listing 12.04. Counsel also asked if the ME found other psychological evidence from the relevant time period and the ME testified that there were references to pain and sleeping poorly. (Tr. 619).

6

## VIII.   Analysis

### A.   Standard of Review.

In reviewing claims brought under the Act, this court's role is a limited one.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991) (citing Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 1427 (1971);  Bloodsworth, 703 F. 2d at 1239.  The Commissioner's decision must be affirmed if it is supported by substantial evidence even when a court finds that the preponderance of the evidence is against the decision of the Commissioner. Richardson, 402 U.S. at 401, 91 S.Ct. at 1427 (1971); Bloodsworth, 703 F.2d at 1239.  "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Further, it has been held that the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."  Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir.1991).  This court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

### B.   Statement of the Law

An individual who applies for Social Security disability benefits or supplemental security income must prove their disability.  See 20 C.F.R. § 404.1512; 20 C.F.R. § 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven their disability.  See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  At the first step, the claimant must prove that he or she has not engaged in substantial gainful activity.  At the second step, the claimant must prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  Id., at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity and age, education, and work history.  Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there

are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

### C. Medical Evidence

**1995**

In August 1995, at the birth of her second child, plaintiff was diagnosed with ITP. (Tr. 193-221). An appointment with a medical hematologist / oncologist was scheduled in two weeks. (Tr. 195). On August 22, 1995, plaintiff was treated by a nurse practitioner under the supervision of Sid Crosby, M.D., for a post-partum check-up and family planning. (Tr. 464-467).          On August 28, 1995, plaintiff was initially examined by Maurine O'Connor, M.D., hematologist for treatment of ITP and monitoring of plaintiff's blood platelet count.  Dr. O'Connor noted plaintiff has "absolutely no complaints at this time" and "has done well over the last three weeks as above with no symptoms." (Tr. 228).  Plaintiff refused admission to the hospital for treatment of ITP and was treated in office with a steroid medication. (Tr. 228).  Plaintiff returned on August 31, 1995, September 11, 1995, September 25, 1995, and October 9, 1995. (Tr. 224-228).  At each visit, plaintiff had no complaints, no symptoms and reported no bleeding.  She did report some weight gain from the steroid medication treatment and muscle soreness on one occasion. (Tr. 223).  On October 18, 1995, plaintiff's spleen was removed as treatment for ITP. (Tr. 229-242).  On October 20, 1995, she was discharged home with instructions to refrain from heavy lifting for four to six weeks, clean the incision, and take medications. (Tr. 231).

**1996**

On April 29, 1996, plaintiff returned to Dr. O'Connor.  Plaintiff reported two recent infections for which she was treated at the emergency room.  The doctor noted skin changes consistent with ITP on plaintiff's lower legs and near the IV site on her right arm. Plaintiff's steroid medication was adjusted and she was advised to return in three weeks. (Tr. 223).

On June 15, 1996, plaintiff was treated at the emergency room.  She reported working at Hodges Video Shop.  She complained of chest pains and shortness of breath.  She reported having had five or six episodes of a sharp chest pain which was worse on deep inspiration but she did not know the previous diagnosis.  The doctor noted a questionable history of respiratory arrest, ITP and a spleenectomy.  Plaintiff's electrocardiogram and chest x-ray were normal. Bronchitis was diagnosed and she was given an anti-biotic and Tylenol. (Tr. 244-247).

**1997**

On January 4, 1997, Dr. O'Connor completed part of a physical capacities evaluation.  She opined that plaintiff was totally restricted from activities involving unprotected heights and moving machinery; mildly restricted from activities involving exposure to marked changes in temperature and humidity, and dust, fumes, and gas; and had no restriction for driving automotive equipment. Dr. O'Connor noted that she did not have a gym to evaluate the other criteria. (Tr. 256).

On January 7, 1997, Dr. O'Connor reported plaintiff had been non-compliant with medication for several months. Other than ITP and anemia, plaintiff's examination was unremarkable and she reported only heavy menstrual bleeding. (Tr. 510).  Plaintiff was prescribed iron supplements for her anemia and steroid medication for the ITP, and her platelet count was evaluated.  On January 28,

1997, plaintiff reported only side effects of her steroid medication and was otherwise without symptoms. (Tr. 509).  From February 25, 1997, through December 16, 1997, plaintiff reported report a sore throat on two occasions, swollen feet on one occasion, and headaches and hot flashes twice, heavy menstrual bleeding several times, rectal bleeding with constipation on one occasion, upper respiratory tract infection on one occasion, and some bruising of her lower legs on one occasion. (Tr. 493-508).[3]  Plaintiff began treatment with Connie Uzel, M.D., hematologist, on September 23, 1997. (Tr. 503).

On December 3, 1997, plaintiff was seen by Dr. Crosby for follow-up of a miscarriage in November 1997. (Tr. 493-496).  He noted plaintiff's report of "a little bit of a headache, cramps and nausea" which he thought related to another illness.  Dr. Crosby noted plaintiff was not bleeding much, denied other problems, and that her platelet count had been doing well.  He noted plaintiff wanted to become pregnant but thought of waiting at least six months because her ITP required medication at that time and she feared prenatal complications. (Tr. 462).

**1998**

On April 21, 1998, plaintiff reported to Dr. Uzel that she had not taken her medications since December and was without any symptoms.  After reading  plaintiff's platelet count, Dr. Uzel noted that

_____

[3] On May 5, 1997, plaintiff reported sore throat and headaches (Tr. 506); on April 23, 1997, she reported swollen feet during her menstrual period (Tr. 503); on September 2, 1997,  she reported rectal bleeding with constipation and some bruising on her lower legs (Tr. 501); on  September 9, 1997, she reported hot flashes and headaches which were improved on September 23, 1997 (Tr. 503-504); on September 30, 1997, she report a sore throat (Tr. 502); October 7, 1997, she had a viral upper respiratory tract infection (Tr. 500); and on November 4, 1997, the doctor noted "patient without complaints at today's visit". (Tr. 496).  In November 1997 plaintiff was diagnosed as pregnant but miscarried on November 23, 1997. (Tr. 493-497).

"[g]iven this patient's age, I believe that her chronic steroid administration is potentially associated with more morbidity than a platelet count of 23K. Therefore, I have not recommended prednisone [steroid] therapy for her today." (Tr. 492).

On May 19, 1998, plaintiff returned to Dr. Uzel with some symptoms of ITP, including bruising and red spots rash on her arms and legs. Steroid medication was administered. (Tr. 491). On June 2, 1998, plaintiff returned and was without symptoms. Her medications were continued. (Tr. 490). On June 16, 1998, plaintiff returned and was again without symptoms though she was experiencing some medication side effects. (Tr. 489). On June 23, 1998, plaintiff had no complaints but for a sore throat. (Tr. 488). On June 30, 1998, plaintiff returned with a sore ankle with some puffiness and an oral infection secondary to her steroid medication. Dr. Uzel discussed the medication protocol for plaintiff's ITP and continued plaintiff on iron supplements for her heavy menstrual bleeding and steroids for ITP. (Tr. 486). On July 7, 1998, plaintiff reported only unpleasantness with steroid medication.(Tr. 483). On July 14, 1998, plaintiff's sore ankle and oral infection had resolved. (Tr. 484). On July 21, 1998, plaintiff was distressed with her weight gain on steroids and reported some "upper arm and leg weakness." (Tr. 483). On examination, Dr. Uzel noted "minimal forearm bruising." (Tr. 483). On August 11, 1998, plaintiff reported to Dr. Uzel that she had been diagnosed with gallstones after emergency treatment for stomach pain and reflux symptoms. Dr. Uzel noted plaintiff had considered having a hysterectomy at the time of her gallstone surgery but thought she may want to "consider having another child." (Tr. 481).

On October 5, 1998, plaintiff was treated by Dr. Crosby for a possible miscarriage and heavy vaginal bleeding. He noted she was non-compliant with her medications for ITP. Her pregnancy test

was negative and she was given medication to control the vaginal bleeding.  She was also counseled on birth control and the risk of pregnancy.  On physical examination he noted plaintiff was "in no distress at all currently." (Tr. 460-461).

On December 22, 1998, plaintiff was treated at the Mobile County Health Department.  The treatment notes are mostly illegible.  It appears she complained of right ear, head and jaw pain, pain in her arm and calf muscle on the right side.  She reported taking no medications.  She reported her jaw pain for the past three days and it appears that the doctor diagnosed a toothache.  It appears that plaintiff reported her calf pain began four days before the visit.  The doctor noted her history of ITP, prescribed medication and ordered blood tests.  He also ordered an ultrasound of the leg to rule out deep vein thrombosis.  The ultrasound was negative. (Tr. 378-380).

**1999**

On March 2, 1999, plaintiff was treated by her family physician, Dr. Crosby for complaints of strain to her mid-back following a fall while moving furniture.  Plaintiff denied chest pain or shortness of breath and no pain in her extremities.  She was diagnosed with muscle strain and given a pain medication and a muscle relaxer. (Tr. 459).

On April 27, 1999, plaintiff was treated at the emergency room for a headache. She was given medication and released. (Tr. 450).

On May 11, 1999, plaintiff reported to Dr. Uzel that she had not been taking her medications because she lost Medicaid coverage.  She reported not taking her iron supplement because of stomach distress. (Tr. 478).  Her gallstone surgery had been performed without incident. (Tr. 478).  On June 8, 1999, plaintiff reported that she was planning dental work and was taking her iron supplement. (Tr.

13

477).  Plaintiff returned to Dr. Uzel on September 28, 1999, and reported increased bruising and worsening fatigue.  Plaintiff reported weight loss and that she ate only one meal per day.  She reported nausea with her iron supplement and Dr. Uzel advised that she take it with her meal.  Dr. Uzel noted plaintiff's ITP was "cyclical and overall in the past has probably averaged above 20K". (Tr. 475).

On October 6, 1999, plaintiff was treated at the emergency room for a "probable anxiety attack." (Tr. 454).  The examiner noted plaintiff's symptoms resolved on arrival and that her neurological examination was normal.  She was released and advised to return if her condition worsened and call her doctor in the morning. (Tr. 454).

On October 12, 1999, plaintiff returned to Dr. Uzel and reported a 4.5 pound weight gain. (Tr. 474).  Dr. Uzel noted plaintiff had an oral infection as a side effect of the steroid medication and that she continued to smoke cigarettes.  She also noted plaintiff had symptoms of hyperventilation without symptoms between episodes. (Tr. 474).

On November 9, 1999, Dr. Uzel noted plaintiff's report that she had self-tapered her medication.  Dr. Uzel adjusted plaintiff's medication and had her complete an application for assistance with medication expense. (Tr. 473).  On November 23, 1999, plaintiff reported to Dr. Uzel that she could not afford one medication so she had taken only her steroid and iron supplement.  Plaintiff reported again that she was concerned with weight loss, "basically eats one meal a day" and "remains busy throughout the day with her children, and therefore skips meals." (Tr. 472).  Plaintiff's thyroid panel was normal and Dr. Uzel noted that plaintiff smoked cigarettes but her chest x-ray was normal.  She advised plaintiff that the weight loss was "almost surely unrelated to" her ITP and advised her to see her family physician. (Tr. 472).

14

**2000**

On January 18, 2000, plaintiff returned to Dr. Uzel and reported pain in her left shoulder, right

forearm and left wrist for about one week.  Plaintiff thought this related to her prednisone and stopped

taking it.  She also reported that she had gained three pounds since her last visit.  Dr. Uzel

recommended plaintiff see her family physician because the complaints were not related to the ITP or

her medications.  Plaintiff was advised to resume her medications. (Tr. 471).   On February 22, 2000,

plaintiff returned to Dr. Uzel and reported an episode of nausea which resolved but had "no neurologic,

respiratory, gastrointestinal, or bony complaints." (Tr. 470).  Dr. Uzel continued plaintiff's medication.

(Tr. 470).  On March 21, 2000, plaintiff returned and Dr. Uzel noted plaintiff was doing relatively well

on her drug therapy "without any significant adverse effects." (Tr. 469).  Dr. Uzel also noted that

plaintiff,

> has no complaints referable to bleeding except for menstrual bleeding.  She is tolerating
> the Danazol therapy relatively well, without any significant adverse effects.  She reports
> ongoing cigarette smoking at one-half pack per day.  She does express a desire to stop
> smoking.  She has no neurologic, respiratory, gastrointestinal or bony complaints.

(Tr. 363).  Plaintiff's medications were Danazol and iron. On examination, Dr. Uzel noted plaintiff was

in no apparent distress and her skin was without ecchymosis, petechiae, or purpura.[4]  Dr. Uzel noted

---

[4] Idiopathic thrombocytopenic purpura is sometimes called immune thrombocytopenic purpura.
The main symptoms are "bleeding, which can include bruising ("ecchymosis") and tiny red dots on the
skin or mucous membranes ("petechiae")" or purpura "purplish- looking areas of the skin and mucous
membranes (such as the lining of the mouth) where bleeding has occurred as a result of decreased
platelet." National Library of Medicine, National Institutes of Health.
http://www.nlm.nih.gov/medlineplus; National Institutes of Health, National Institute of Diabetes,
Digestive and Kidney Disease, Division of Hematologic Diseases.
http://www.niddk.nih.gov/health/hematol/pubs/itp/itp.htm;

her plan that plaintiff would continue taking medication and return for a platelet check in one month.

Plaintiff missed her appointments in April and May of 2000 (Tr. 361-362).  She returned on October 31, 2000.  Plaintiff reported taking her steroid medication one day per week because of stomach distress and taking iron three times a day.  Her physical examination was normal.  Her blood test indicated that she had been non-compliant with her medications.  Plaintiff also reported the absence of a menstrual cycle for two months and negative home pregnancy tests.  Dr. Uzel diagnosed ITP and anemia secondary to menstrual blood loss and complicated by the ITP, obtained a pregnancy test which was negative, advised plaintiff to resume her medication and return in one week. (Tr. 360).

**2001**

Plaintiff returned to Dr. Uzel on June 19, 2001.  She reported having all of her upper teeth extracted without a platelet determination prior to extraction.  Plaintiff reported taking her medications and having some oozing afterward but no heavy bleeding.  Her present concern was an episode of momentary dizziness and a sensation of blacking out which occurred that morning while moving from a sitting to standing position and menstrual irregularity.  Dr. Uzel noted that plaintiff stopped her medications approximately three weeks before the visit.  She also noted that plaintiff had "no neurologic, respiratory, gastrointestinal, cardiac or bony complaints." (Tr. 357).  Plaintiff was noted as non-compliant with her medications.  She also reported that she was six weeks past her last menstrual cycle.  Plaintiff's pregnancy test was negative.  She was advised to resume her medications and return in eight weeks.  She was also strongly counseled to stop smoking. (Tr. 358).

Plaintiff returned to the Board of Health on July 24, 2001.  She complained that she was "getting nervous" and "unable to sleep at night intermittently" for the past year.  She reported taking

16

medication for her ITP.  The doctor's notes are difficult to read but it appears that on examination, the doctor noted plaintiff had been nervous and experiencing anxiety for a "couple of years".  (Tr. 377). The doctor noted plaintiff denied chest pain and shortness of breath but complained of feeling depressed.  It appears that the doctor diagnosed depression and anxiety and prescribed Paxil, Tylenol for headaches, and recommended plaintiff have a psychiatric evaluation and her annual gynecological examinations. (Tr. 376).  On July 26, 2001, plaintiff was notified that she needed iron. (Tr. 375).

Plaintiff returned to Dr. Uzel on September 4, 2001.  She reported some bruising and heavy, irregular menstrual cycles but was otherwise without complaint.  Plaintiff reported compliance with medications but for one week when she went out of town and forgot her medications.  On examination, Dr. Uzel noted plaintiff had "a couple of small hemorrhagic areas (approximately 2-3 millimeters) on the tongue and one other area of hemorrhage in the mouth. (Tr. 355).   Dr. Uzel assessed ITP and noted it was responsive to the steroid and intravenous gammaglobulin treatment, though she was uncertain whether there had been an adequate trial period of one medication.  She also assessed iron deficiency anemia secondary to menstrual blood loss complicated by the ITP.  Plaintiff was advised to continue her medications and return in two weeks. (Tr. 355-356).

Plaintiff returned to the Board of Health on October 10, 2001 with complaints of nerves. Again, the doctor's notes are difficult to read but it appears he prescribed Celexa, an anti-depressant, another illegible medication, and Benadryl. (Tr. 374).

On November 29, 2001, Dr. Uzel wrote plaintiff's attorney as follows:

Ms. Rivers has a hematologic condition known as idiopathic thrombocytopenia purpura (ITP).  ITP is typically not painful.  The medications I have prescribed should not limit ability to work.  I can not complete your physical capacities evaluation, as these

17

maneuvers are not assessed in my hematology clinic.  Ms. Rivers does indeed have marked thrombocytopenia although treatment has been difficult as she misses appointments rather often.  People with ITP would be poor candidates for work which would be at a higher than ususal risk for trauma or injury.

(Tr. 354).

### D.   Mental examination reports

On February 3, 1997, plaintiff was examined by Blane C. Crum, Ph.D..  He noted her report that she was the single mother of two children ages eighteen months and four years, that she completed the tenth grade in regular classes and last worked in May 1996 as a clerk for a video store.  He noted her report that her illness requires her to "be extremely careful not to harm or injure herself" and that she "can not use knives or climb stairs." (Tr. 249).  Dr. Crum noted plaintiff's report of depression which causes her to cry for no reason.  She also reported she is "often 'shaky and nervous'" but did not have "suicidal thoughts" and has not had "formal mental health care." (Tr. 249).  He found plaintiff was polite and friendly, and open with him and that this assessment was representative of her personality. (Tr. 249).

In addition to the clinical interview, Dr. Crum administered the Minnesota Multiphasic Personality Inventory -2 (MMPI-2) and the Mooney Problem Checklist.  Dr. Crum noted her test results indicated she perceived "herself as struggling with a serious illness and complains of being tired much of the time and sleeping poorly." (Tr. 250).  He noted her report that she lacked self-confidence and "is basically awkward in dealing with others. She feels isolated and feels she does not have real friends.  This relates in part, to her underlying feelings of loneliness."  (Tr. 250).  He also noted her report that she cries easily, her feelings are easily hurt, and that others perceive her as "nervous and high

18

strung". (Tr. 250).

Dr. Crum noted that the MMPI-2 results indicate plaintiff "works hard to project herself in a positive manner" and that her emphasis was on depression and diminished energy level.  He also noted the test suggested "a focus and preoccupation of health matters" which was a "dominate (sic) factor in her daily adjustment" and "an undercurrent of chronic worrying and a tendency to obsess about health matters." (Tr. 250).  He also noted plaintiff was "distrustful of others and likely isolates herself as a means of protection from being emotionally hurt." (Tr. 250).  Dr. Crum noted plaintiff's scoring was elevated on the Anxiety Scale, Depression Scale and Health Scale.  He found that the anxiety scale reflected an "undercurrent of being anxious, worried and apprehensive about matters", "difficulty concentrating and a perception that life is difficult" which "taps into her low self esteem and general feelings of being overwhelmed by daily matters." (Tr. 250).  He noted that the Depression scale indicated "general feelings of depression, fatigue, and a diminished interest in daily activities", "pessimism and general hopeless orientation towards the future." (Tr. 250).  He noted that her Health Scale indicated "her denial of good physical health and a preoccupation of bodily functions" and that she "feels 'worn out' and lacks energy." (Tr. 250).

In summary, Dr. Crum stated as follows:

Dana projects herself as a serious minded individual who is prone to focus on health symptomotology, as well as, struggling with depression.  Her energy level has declined and she will likely have difficulty negotiating daily responsibilities.  Such features likely intensifies her health concerns.  It would appear that she would benefit from some form of mental health intervention and, perhaps, she should be considered for anti-depressant medication through a psychiatric consultation.

(Tr. 251).   He diagnosed major depression with a secondary diagnosis of somatization disorder. (Tr.

250).  Dr. Crum completed a supplemental questionnaire regarding plaintiff's mental residual functional capacity and found plaintiff had moderate restriction of activities of daily living and maintaining social functioning, and would frequently have deficiencies of concentration, persistence and pace, and episodes of decompensation or deterioration in work or work-like settings. (Tr. 252).  He also found plaintiff had marked limitation of the ability to understand, carry out and remember instructions; moderate limitation of the ability to respond appropriately to supervision and co-workers; and moderate limitation of the ability to perform simple, repetitive tasks. (Tr. 252-253).  He estimated that these limitations would last longer than twelve months and that they began in May 1996. (Tr. 253).  He also found that plaintiff "is depressed [with] a strong focus on health matters.  Her energy level is diminished [and] she has difficulty concentrating.  Mental health intervention may help." (Tr. 253).

On June 27, 2000, plaintiff was consultatively examined by Annie Formwalt, Ph.D., in conjunction with her second application for benefits.  Dr. Formwalt noted plaintiff's report of her treatment for ITP, severe headaches, anxiety attacks occurring two to three times per month for the past six months, and symptoms of depression: sadness, crying for no reason, restricted range of activities, social withdrawal, irritability, anergia, initial insomnia with frequent awakenings, decreased appetite and weight loss.  She noted plaintiff denied suicidal or homicidal ideation and auditory or visual hallucinations.  Plaintiff reported that her depression is secondary to her illness because she can't do things she once did and is "no longer an outgoing person but is a homebody." (Tr. 574).  Dr. Formwalt noted plaintiff's report that she lost her most recent job because she "went into respiratory arrest ...they

wouldn't hire me ... due to ITP." (Tr. 575).[5]  She noted plaintiff was independent in personal hygiene and reported caring for her two children and living with her boyfriend.  She noted plaintiff's report of fatigue and dizziness which prevented her from driving, standing more than ten or fifteen minutes, showering, or shopping without assistance.  Her daily activities consisted of getting her children off to school, cooking and resting. (Tr. 575).

Dr. Formwalt conducted a mental functioning assessment and noted plaintiff's "mood seems somewhat depressed" but she did "not appear anxious" and diagnosed an adjustment disorder with depressed mood and panic disorder without agoraphobia.  She found that "[i]t is likely that within the next six to twelve months [plaintiff] will receive some benefit from treatment of her symptoms of depression and anxiety.  However she may have difficulty performing adequately in a work setting due to her reported medical problems." (Tr. 576).

On January 28, 2002, plaintiff was consultatively examined by C.E. Smith, M.D., psychiatrist. Dr. Smith noted her report that she lives with her husband and two children and her report of her family and medical history.   He noted her report that her diagnosis with ITP had caused "'something like a nervous breakdown  – panic attacks – manic depression.'" (Tr. 635).   Plaintiff denied any psychiatric treatment for, inpatient or outpatient.  However, she reported that she was taking Celexa, an anti-depressant for panic attacks.  She reported smoking a half pack of cigarettes per day but denied drug or alcohol use. (Tr. 625).

---

[5]  Plaintiff refers to work at Hodges Video Shop.  She told Dr. Crum that she last worked at a video store. (Tr. 249).  Her medical records indicate that her episode of breathing problems was bronchitis. (Tr. 244-247).

Dr. Smith noted plaintiff's report that she keeps the house, cooks, cares for her children, enjoys television, especially the Discovery Channel but does not listen to the radio and does not read. She reported that her children have a computer but she does not know how to use it. She reported that she has no friends, does not socialize, does not exercise, and a relative helps her shop because she is not able. She reported medication side effects of dizziness and blurred vision and leg pain. (Tr. 636). She reported having a driver's license and drives, and that she attends church when she can. Plaintiff reported symptoms of an inability to sleep more than four hours, not eating, no energy, poor memory, and crying a lot. Dr. Smith also noted that when "[a]sked if she had ever had suicidal ideations she said, with a smile, 'sometimes'". (Tr. 636).

On observation, Dr. Smith found plaintiff was attractive, pleasant, properly groomed and attired, and on cognitive testing, found plaintiff of normal intelligence. He found she was oriented, coherent, with appropriate affect and intact memory and appeared euthymic. (Tr. 636). He did note that plaintiff "walked in with a severe limp, as she favored her left leg, and appeared to me to favor her right leg as she walked out." (Tr. 636).

Dr. Smith noted that plaintiff reported her disabilities were her depression, dizziness and not being able to use her arms and legs as she wants, and having to have people help her. Dr. Smith then stated as follows:

> As I was at a loss for an explanation of the troubles with her limbs, I asked Ms. Rivers her explanation of what she thought was wrong. She said that her medications have made her bone deteriorate. When I asked her what medicine she was referring to she noted Prednisone.

(Tr. 536). In summary, Dr. Smith noted that apart from plaintiff's bleeding disorder, "her record

22

illustrates some unusual and unexplained symptoms and signs, which appeared the case during my interview or her" (Tr. 636).  He noted plaintiff complained of depression and panic attacks and was treated with antidepressant medication but she "presented well from the psychiatric point of view" and that she "understood, remembered and carried even complex instructions." (Tr. 636).  He diagnosed a dysthymic disorder. (Tr. 637).

Dr. Smith completed a psychiatric technique review form wherein he found plaintiff was mildly limited in all areas of functioning including maintaining social functioning and activities of daily living.  He found plaintiff was not limited in the areas the ability to understand, remember and carry out simple, one and two step instructions and complex, detailed instructions, and was not limited in the ability to maintain concentration, persistence or pace for periods of at least two hours. (Tr. 638-639).

### E.    Plaintiff's Argument

**1. Whether the Administrative Law Judge (ALJ) erred in failing to comply with the doctrine of collateral estoppel.**

Plaintiff argues that collateral estoppel bars re-litigation of the same issue and that the issue before Judge Alan E. Michel and Judge David R. Murchison was whether the evidence supported a finding of disability.  Plaintiff argues that because ALJ Michel, the ALJ assigned to plaintiff's second claim, decided on July 23, 2001, that plaintiff was disabled beginning January 4, 2000, the ALJ in this case, ALJ Murchison, is collaterally estopped from finding that plaintiff was not disabled during the time period preceding January 4, 2000. (ALJ  Murchison entered his decision on June 27, 2002.)   Plaintiff points out that ALJ Michel's decision covers the time period from January 4, 2000 to the present and ALJ Murchison's decision covers the time period from April 24, 1996 through January 3, 2000.

Plaintiff argues that because the two ALJs relied upon essentially the same evidence to reach their decisions,[6] ALJ Michel's administratively final decision that plaintiff is capable of performing less than a full range of sedentary work collaterally estops ALJ Murchison from finding plaintiff was limited to a reduced range of light, unskilled work and thus not disabled.

Plaintiff supports her argument by reference to Drummond v. Commissioner of Social Security, 126 F. 3d 837 (6th Cir. 1997).  In Drummond, as in the present case, the claimant filed more than one application.  The initial ALJ found the claimant was capable of sedentary work and not disabled and this decision became administratively final.  On Drummond's second claim, the ALJ dismissed her application for benefits for the time period covered by the earlier claim and found Drummond was capable of medium exertional work for the subsequent time period.  Noting the change in residual functional capacity from sedentary to medium exertional work, the Drummond court held that "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." 126 F.3d at 842.

However, Drummond involves a different chronology.  In Drummond, the first ALJ decision adjudicated the earlier time period and the second ALJ decision adjudicated the later time period.  Thus, Drummond addressed the progression of the plaintiff's residual functional capacity.  In the present case, the first ALJ decision (ALJ Michel) adjudicated the later time period and the second ALJ decision (ALJ Murchison) adjudicated the earlier time period.  In other words, even though ALJ

_____

[6] ALJ Murchison reviewed the same evidence as did ALJ Michel.  However, he also reviewed evidence that was submitted after ALJ Michel's decision was entered, including evidence from Dr. Uzel, the treating physician, and the consultative examination by Dr. Smith, the psychiatrist.

Michel entered the first final decision regarding plaintiff's residual functional capacity and ability to work, he adjudicated a later time period than did ALJ Murchison.

Defendant cites to <u>Rucker v. Chater,</u> 92 F. 3d 492 (7th Cir. 1996) wherein the Court found neither res judicata nor collateral estoppel applied because the second ALJ considered a different time period.  The Court found that the

> hearing before the second ALJ, therefore, was not a "re-evaluation" of the evidence, but rather an independent consideration of her eligibility at the time of her second application.  The time period was different, and a different outcome is not necessarily, inconsistent.

<u>Id.</u> at 495.   The Court disagreed with Rucker's contention that the first ALJ's findings established her residual functional capacity "forever more" and found that the first ALJ's decision was binding only for that time period.  The Court held that the decision "has no effect, however, on an application for disability benefits for a subsequent time period." <u>Id.</u>

Because the ALJ's decisions address different time periods, the undersigned finds that the doctrine of collateral estoppel does not apply.   The regulations discuss collateral estoppel as follows:

> (f) Collateral estoppel--issues previously decided. An issue at your hearing may be a fact that has already been decided in one of our previous determinations or decisions in a claim involving the same parties, but arising under a different title of the Act or under the Federal Coal Mine Health and Safety Act. If this happens, the administrative law judge will not consider the issue again, but will accept the factual finding made in the previous determination or decision unless there are reasons to believe that it was wrong.

20 CFR § 416.1450 (2005).  However, in the present case, the previously determined fact upon which plaintiff relies is ALJ Michel's finding that she has the residual functional capacity for less than the full range of sedentary work from the time period beginning January 4, 2000.  ALJ Michel did not make a

25

finding in regard to plaintiff's residual functional capacity prior to that time.  Further, if there is evidence of decline or improvement, a subsequent ALJ is not always bound by the residual functional capacity determination of prior ALJ.  See Rucker v. Chater, 92 F. 3d 492, 495 (7th Cir. 1996) (finding that different conclusions about plaintiff's residual functional capacity were "entirely plausible" when the applications were four years apart.)  In the present case, plaintiff filed her first application in April 1996 and her second application in February 2000.  Cf. Lively v. Bowen, 820 F. 2d 1391, 11392 (4th Cir. 1987) (applying collateral estoppel to a second application filed several weeks after the ALJ's denial of the first application because it was "utterly inconceivable that [Lively's] condition had so improved in two weeks as to enable him to perform medium work."); Senters v. Secretary of Health & Human Services, 1992 WL 78102 (6th Cir. 1991)(per curiam)( an unpublished decision) (finding that the evidence showed a "substantial improvement in plaintiff's functional capacity subsequent to . . . the date of the previous decision.").

ALJ Murchison acknowledged that ALJ Michel found plaintiff disabled as of January 4, 2000, and then addressed the issue of whether plaintiff was disabled during the time period from April 24, 1996 through January 3, 2000. (Tr. 284).  ALJ Murchison is not bound by ALJ Michel's finding that plaintiff is disabled after January 3, 2000.  The issue of whether plaintiff was disabled from April 24, 1996 through January 3, 2000, has not previously been adjudicated.  Also, ALJ Murchison is not bound by ALJ Michel's decision that plaintiff has the residual functional capacity for a reduced range of sedentary work beginning on January 4, 2000.  The issue of plaintiff's residual functional capacity between April 24, 1996 through January 3, 2000 had not previously been adjudicated.   Accordingly, plaintiff's collateral estoppel argument is without merit.

**2. Whether the ALJ erred in failing to pose a proper hypothetical question to the vocational expert.**

Plaintiff argues that the hypothetical question posed to the vocational expert did not include the elements of a moderate restriction of the ability to maintain social functioning and a moderate deficiency of concentration, persistence and pace. Plaintiff points out that the ALJ identified these functional limitations in making his residual functional capacity assessment. Plaintiff argues that the VE's response to the incomplete or inaccurate hypothetical question can not constitute substantial evidence upon which the ALJ could rely to find plaintiff could perform other work which exists in significant numbers in the national economy.

The ALJ found plaintiff was limited to unskilled work which did not require more than occasional contact with co-workers, supervisors and the general public. He also found plaintiff has mild restrictions of her activities of daily living, moderate restriction of her ability to maintain social functioning, moderate deficiencies of concentration, persistence or pace, but would not experience episodes of decompensation. (Tr. 291, 293).

As part of the hypothetical question, the ALJ asked the VE to assume the elements of a person of plaintiff's age, education and past relevant work but who was limited to unskilled work and "work that involved only occasional interaction with [the] general public, coworkers and supervisors". (Tr. 621). The VE responded that the person could perform the jobs of laundry folder, cafeteria attendant, and hotel housekeeper. (Tr. 621-622). The ALJ then added the elements of a "marked limitation in the ability to maintain attention and concentration for extended periods", "a marked limitation in the ability to work in coordination with or proximity to others without being distracted by them and a marked

limitation in the ability to accept instructions and respond appropriately to criticism from supervisors."
(Tr. 622). The VE responded that the person could not sustain work in the jobs identified. (Tr. 622).
However, the ALJ did not present a hypothetical question which included a moderate restriction of the
ability to maintain social functioning and moderate deficiencies of concentration, persistence and pace.

In the decision, the ALJ noted that he had asked the VE to assume a person of plaintiff's age,
education and absence of past relevant work who was limited to light exertional work and must avoid
machines and heights but who was "capable of performing unskilled jobs as long as there is only
occasional interaction with co-workers, supervisors, and the general public." (Tr. 292). The VE
identified the jobs of laundry folder, cafeteria worker, and houekeeper all of which exist in significant
numbers in the national economy. (Tr. 292). The ALJ then determined that the opinion of the VE was
consistent with the record and found that there were a significant number of jobs which plaintiff could
perform during the period under consideration. (Tr. 292).

The Government argues that the ALJ's finding that plaintiff had moderate limitations of the
ability to maintain concentration, persistence and pace does not establish how this impairment affected
her ability to work. However, the Government also argues that the non-examining agency consultant
indicated plaintiff could attend and concentrate for two hours at a time as required for unskilled work
and that this finding is supported by Dr. Smith's finding that plaintiff could understand, remember and
carry out detailed or complex instructions and her daily activities. (Doc. 14, p. 18-19). Therefore, the
Government argues that the hypothetical question which contained the element of unskilled work
accurately reflected plaintiff's ability.

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must

pose a hypothetical question which comprises all of the claimant's impairments." Wilson v. Barnhart,

284 F. 3d 1219, 1227 (11th Cir. 2002) citing Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir.1999),

cert. denied, 529 U.S. 1089, 120 S.Ct. 1723 (2000).  If the ALJ relies upon a VE's response to a

hypothetical question as substantial evidence to support a determination that plaintiff can perform other

work which exists in significant number in the national economy, then the elements of the hypothetical

question must comprehensively describe all of plaintiff's exertional and non-exertional functional

limitations. See Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir.1995); Welch v. Bowen, 854 F.2d

436, 440 (11th Cir. 1986); McSwain v. Bowen, 814 F. 2d 617, 619-620 (11th Cir. 1986); Pendley v.

Heckler, 767 F.2d 1561, 1562-1562 (11th Cir. 1985) (per curiam).  Also, the elements of the

hypothetical question must be supported by substantial evidence. Graham v. Bowen, 790 F.2d 1572,

1573 (11th Cir. 1986); see Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir.1989); Cowart v.

Schweiker, 662 F.2d 731, 736 (11th Cir.1981) ("Although there is no per se rule that a vocational

expert be called to testify ... the ALJ must articulate specific jobs that the claimant is able to perform,

and this finding must be supported by substantial evidence, not 'mere intuition or conjecture by the

administrative law judge.'").

In Owes v. Barnhart, No. 02-11139, slip op. (11th  Cir. October 8, 2002) (per curiam), the

Eleventh Circuit held that the hypothetical question posed to the VE was not adequate because the ALJ

failed to include his findings that Owes had a pain disorder with depression, borderline intellectual

functioning and would often experience deficiencies of concentration, persistence and pace.  Id. at 4-5.

The circuit court also found that

[a]lthough the ALJ found that Owes could perform 'simple and routine unskilled jobs

29

> consisting of repetitive activities' . . .  This does not mean that the failure to include the mental impairments in the second hypothetical question was harmless.  See Newton v. Chater, 92 F. 3d 688, 695 (8th Cir. 1996) (holding that even though the ALJ's hypothetical question limited the claimant to simple jobs, the hypothetical question was inadequate because it neglected to include the ALJ's finding on the PRTF that the claimant often would manifest 'deficiencies of concentration, persistence, or pace resulting in the failure to complete tasks in a timely manner.')

Id. at 6-7.  The circuit court held as follows:

> we cannot assume that the vocational expert would have responded the same way to the second hypothetical question if the question had included Owes's mental impairments.  (Citations omitted).  We do not know whether the fact that Owes "often" experiences "deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner" would make him unable to perform the job of agricultural product sorter or sedentary food sorter.  Thus, we cannot say that the Commissioner met the burden of proving that Owes could perform other work in the national economy.

Id. at 7.  The case was reversed and remanded for further vocational expert testimony. Id.

In the present case, the ALJ found plaintiff had moderate restriction of her ability to maintain social functioning and moderate deficiencies of concentration, persistence and pace. (Tr. 219). However, as plaintiff argues, the ALJ did not include these elements in the hypothetical question presented to the VE, even though he did ask the VE to assume a person limited to unskilled work which did not require more than occasional interaction with co-workers, supervisors and the general public. (Tr. 621).

In reliance upon the decision in Owes, the undersigned also "cannot assume" that the VE's testimony regarding other work in the national economy which plaintiff could perform would been the same if the hypothetical question had included plaintiff's mental impairments listed above.  Owes at 7. The undersigned finds that in accord with the decision in Owes, the ALJ's determination that plaintiff

30

could perform unskilled work, though supported by substantial evidence in the record, does not

necessarily take into account the mental functional limitations as determined by the ALJ.   The

Government argues that the finding that plaintiff has the ability to concentrate and attend to task for two

hours of time is subsumed in the finding that she can perform unskilled work.  However, the ALJ did

not determine that plaintiff could concentrate for two hours at a time, but instead found that she had a

moderate restriction of her ability to maintain concentration.  Accordingly, the undersigned recommends

that the case be **reversed and remanded** for additional VE testimony based upon a proper

hypothetical question containing all of plaintiff's mental impairments which the ALJ determined were

supported by substantial evidence in the record: limitation to unskilled work, limitation to work which

does not require more than occasional interaction with co-workers, supervisors and the general public,

moderate restriction of the ability to maintain social functioning, moderate deficiencies of concentration,

persistence and pace, and mild restriction of activities of daily living. [7]


### 3. Whether the ALJ erred in rejecting the opinion of Blaine C. Crum, Ph.D.

Plaintiff argues that because Dr. Crum administered the only psychological evaluation during the

relevant time period, the ALJ erred by rejecting his opinion and that if Dr. Crum's opinion had been

accepted, plaintiff would have met Listing 12.04 for the relevant time period.  Plaintiff also argues that

the reasons giving for rejecting Dr. Crum were not supported by the evidence.  Specifically, the plaintiff

---

[7]  Plaintiff does not argue that her mild restriction of activities of daily living should have been included in the hypothetical question.  Admittedly, this mild restriction would not likely have a significant impact on the occupational base at step five.  However, in framing a complete hypothetical question on remand, the element should be considered.

states that the ALJ erroneously found that Dr. Crum's opinion that plaintiff was "friendly and open" was contradictory to the "information in his report" because the report also contained a statement that plaintiff "works hard to project herself in a positive manner." (Tr. 288, 447-488). (Tr. 289-290).

Plaintiff also points out that the ALJ erred by relying upon the opinion of Dr. Smith who examined plaintiff one time on January 28, 2002, which was after ALJ Michel determined she was disabled beginning January 4, 2000.  Plaintiff argues that Dr. Smith's opinion has little relevance to the period from April 24, 1996 through January 3, 2000.

The ALJ discussed Dr. Crum's February 1997 examination report. (Tr. 288).  He reiterated Dr. Crum's opinion that plaintiff would frequently have deficiencies of concentration, persistence and pace, frequently experience episodes of decompensation or deterioration in work or work-like settings, and had moderate restriction of activities of daily living and maintaining social functioning. (Tr. 252, 288).  He then found as follows

> The [ALJ] notes that the claimant told Dr. Crum that she cooks, drives a vehicle, visits friends and visits her family.  The claimant also indicated that she engages in household chores, runs errands, shops for articles and watches television and movies.  The claimant also indicated that she is capable of taking care of her personal needs and taking care of two children. The [ALJ] also noted that throughout the period in question in this case, and thereafter, the claimant has never sought any treatment from a mental health care professional.  Dr. Crum characterized the claimant as friendly and open and, therefore, the [ALJ] finds that the opinion of Dr. Crum contradicts, to a large extent, the information contained in his report.

(Tr. 288).

The ALJ also discussed the report prepared by Dr. Formwalt in June 2000 wherein plaintiff reported anxiety attacks, sadness and crying for no reason.  He noted Dr. Formwalt diagnosed

32

depressed mood with a panic disorder without agoraphobia and found plaintiff would improve in six to twelve months with treatment.  He noted that the record did not indicate plaintiff sought any treatment, that plaintiff did not report panic attacks to Dr. Uzel and did not mention panic attacks in her testimony in July 2001. (Tr. 289).  The ALJ then concluded that plaintiff's panic attacks lasted no longer than a six-month period. (Tr. 289).  The ALJ found plaintiff has the severe impairment of panic disorder without agoraphobia but this impairment did not last for twelve consecutive months. (Tr. 287, 293).  The ALJ also noted that plaintiff did not seek mental health treatment after the consult with Dr. Formwalt and found that "if the claimant genuinely experienced the degree of mental pathology that she alleged she would have sought psychiatric treatment".  (Tr. 288).

The ALJ discussed the report from Dr. Smith, the psychiatrist, prepared in January 2002.  He noted Dr. Smith's report of plaintiff's report of her educational and familial history, housework, cooking, caring for her children, watching television especially the Discovery Channel, having a driver's license and driving a vehicle.  The ALJ noted Dr. Smith's report that plaintiff smiled when she reported sometimes having suicidal ideas and noted she did not relate this to Dr. Crum or Formwalt.  The ALJ then found Dr. Smith's report of this smiling response indicated he "did not believe she truly experienced such feelings." (Tr. 289).  The ALJ noted Dr. Smith's diagnoses of a dysthymic disorder and his finding plaintiff would have a mild inability to respond appropriately to supervisors, co-workers and members of the public; mild limitation regarding her ability to maintain social functioning and activities of daily living; "no inability to understand, remember and carry out detailed or complex instruction"; and "no inability to maintain attention, concentration or pace for periods of at least two continuous hours." (Tr. 289).

33

The ALJ stated that he considered the medical evidence and plaintiff's testimony regarding her mental impairments. He also noted plaintiff's testimony at her most recent hearing that her depression and anxiety had worsened, her social life decreased, and she was "unable to be around other people." (Tr. 289). He gave controlling weight to Dr. Smith's opinion that plaintiff has dysthymic disorder and stated that his opinion was entitled to greater weight because he is a psychiatrist. The ALJ then determined plaintiff has a "mild to moderate limitation regarding her ability to maintain social functioning" and that "during the period in question, had the ability for only occasional contact with co-workers, supervisors and the general public." (Tr. 289). The ALJ also noted that the medical expert, Dr. Davis, after reviewing the records, testified that plaintiff has "mild to moderate limitation regarding her ability to engage in social interaction" and that he found Dr. Davis' opinion "fully consistent with the record ...considered as a whole." (Tr. 290). He also noted that he gave "little weight to the opinion of the consulting psychologist [Dr. Crum] who examined the claimant on only one occasion." (Tr. 290).

The ALJ found plaintiff has the residual functional capacity for unskilled light exertional work which does not include work at heights or around moving machinery and without more than occasional contact with co-workers, supervisors and the general public. He also found that plaintiff was mildly restricted in her activities of daily living, moderately restricted in the ability to maintain social functioning, would experience moderate deficiencies of concentration, persistence or pace, but would not experience episodes of decompensation. (Tr. 291).

It is the ALJ's function to determine plaintiff's residual functional capacity through examination of the evidence and resolution of conflicts in the evidence. "The ALJ's task is to examine the evidence and resolve conflicting reports." Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996) citing Powers

34

v. Heckler, 738 F.2d 1151, 1152 (11th Cir.1984) (per curiam); Grant v. Richardson, 445 F.2d 656

(5th Cir.1971) (per curiam) ("Moreover, the resolution of any conflict in the evidence, including

conflicting medical opinions, as in the case at hand, and the determination of questions of credibility of

the witnesses are not for the court; such functions are solely within the province of the Secretary."); 20

C.F.R. § 404.1546, 20 C.F.R. § 416.946.

The ALJ has wide latitude as finder of fact to evaluate the weight of the evidence, Owens v. Heckler,

748 F.2d 1511, 1514 (11th Cir.1984).

The undersigned finds that the ALJ did not commit reversible error by failing to accept the

opinion of Dr. Crum.  Plaintiff argues that the ALJ should have accepted his opinion because it is the

only psychological opinion rendered during the relevant time period from April 1996 through January 3,

2000.  However, the evidentiary record does not support Dr. Crum's significantly limiting findings.

Plaintiff did not report disabling psychological symptoms to her treating physicians during this time frame

and plaintiff did not seek treatment for her mental impairment until July 24, 2001.  Dr. Uzel's records

and Dr. O'Connor's records support the ALJ decision in this regard. (see supra, summary of medical

records).

The ALJ also set forth other specific reasons for rejecting Dr. Crum's opinion.  He specifically

noted plaintiff's report of her daily activities as she reported them to Dr. Crum, noting that plaintiff

reported she"cooks, drives a vehicle, visits friends and visits her family.  The claimant also indicated that

she engages in household chores, runs errands, shops for articles and watches television and movies."

(Tr.  288).  The ALJ was within the parameters of his duty to rely upon plaintiff's reports of her

activities of daily living. Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir.1987) (An ALJ may also

consider daily activities when evaluating subjective complaints of disabling pain and other symptoms.);
see also 20 C.F.R. § 404.1529(c)(3)(I); 416.929(c)(3)(I) ("Factors relevant to your symptoms, such as pain, which we will consider include: (I) Your daily activities[.]").

The ALJ also noted that Dr. Crum's characterization of plaintiff as "friendly and open" was contradictory "to a large extent, to the information contained in his report." (Tr. 288).  Dr. Crum noted plaintiff was "distrustful of others and likely isolates herself as a means of protection from being emotionally hurt." (Tr. 250).  The two opinions do appear contradictory especially when considered with the absence of any indication of difficult communicating with Dr. Uzel, Dr. O'Connor, Dr. Crosby, Dr. Formwalt and Dr. Smith.

In sum the undersigned finds that substantial evidence supports the ALJ's determination of the plaintiff's mental impairments.  Thus, the ALJ did not commit reversible error in failing to accept  Dr. Crum's consultative opinion.


## IX.    Conclusion

Upon consideration of the administrative record and the memoranda of the parties, and for the reasons set forth, it is recommended that this action be **reversed and remanded** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings not inconsistent with this report and recommendation. Melkonyan v. Sullivan, 501 U.S. 89, 111 S.Ct. 2157 (1991).  Remand pursuant to sentence four of § 405(g) makes plaintiff a prevailing party for purposes of the Equal Access to Justice Act, 28 U.S.C. § 2412, Shalala v. Schaefer, 509 U.S. 292, 113 S.Ct. 2625 (1993), and terminates this court's jurisdiction over this matter.

The attached sheet contains important information regarding objections to this  <u>report and recommendation.</u>

**DONE** this the <u>24th</u> day of March, 2005.

<u>/s / Kristi  D.  Lee</u>
**KRISTI   D.  LEE**
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.     **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.     **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.     **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

**/s/ Kristi  D. Lee**
**UNITED STATES MAGISTRATE JUDGE**